# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

CARRIANE M. WHYTE,

Plaintiff,

v.                                                    5:14-CV-1528
                                                      (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

E. KENTON FOULKE, ESQ., for Plaintiff
SERGEI ADEN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

On September 26, 2008, plaintiff protectively filed[1] applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") Benefits, alleging disability beginning January 1, 2007. (Administrative Transcript ("T.") at 14, 190-99). Plaintiff's claims were denied initially on April 6, 2009, and she made a

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

timely request for a hearing before an Administrative Law Judge ("ALJ"). (T. 14, 85-86, 95). The hearing, at which plaintiff and vocational expert ("VE") Luther D. Pearsall testified, was conducted by ALJ Susan Wakshul by video conference on October 15, 2010. (T. 25-84).

In a decision dated December 6, 2010, ALJ Wakshul found that plaintiff was not disabled. (T. 11-24). The Appeals Council denied plaintiff's request for review on June 9, 2011. (T. 4-7). On September 2, 2011, plaintiff commenced an action challenging the decision in the Northern District of New York, Case No. 5:11-CV-1051 (MAD/TWD). (T. 644-58). Plaintiff and the Commissioner consented to a remand for additional administrative action, and such remand was approved by the Honorable Mae A. D'Agostino on June 25, 2012. (T. 659-61).

On August 6, 2012, the Appeals Council vacated the December 6, 2010 ALJ decision and remanded the case for a supplemental hearing and a redetermination of disability. (T. 551, 662-67). On April 2, 2013, ALJ John P. Costello held a supplemental hearing at which plaintiff and vocational expert Julie A. Andrews testified. (T. 575-625). On May 29, 2013, ALJ Costello issued a decision finding that plaintiff was not disabled from the date of her application through the date of ALJ Costello's decision. (T. 548-69). ALJ Costello's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on October 14, 2014.[2] (T. 540-44).

---

[2] Because this court is only reviewing the May 29, 2013 determination, all subsequent references to the "ALJ" refer solely to ALJ Costello.

## II.  APPLICABLE LAW

### A.  Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to

3

perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps.  However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include

that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

As of the date of the administrative hearing in April 2013, plaintiff was 29 years old. (T. 580). Plaintiff was enrolled in special education classes at an early age due to learning disabilities, and had completed the 11th grade. (T. 32, 388, 584-85, 861). She had taken the GED examination several times without success. (T. 585, 902). She lived alone, but had a six year old daughter who stayed with her on the weekend. (T. 580, 861). Plaintiff's mother, who lived next door, had joint custody of the child during the week. (T. 52-53, 596). Plaintiff reported that she visited her mother, stepfather, and daughter regularly, and that her mother regularly assisted her with chores such as shopping and laundry. (T. 596-97, 864, 902).

Plaintiff had a brief employment history, that included work as nursing home aide, dish washer, and food service employee. (T. 581-83, 861). She was terminated from her most recent employment in 2008, after having an argument with her co-worker. (T. 582). Plaintiff had previously been incarcerated for repeated violations of court orders of protection, and attributed her difficulties obtaining employment to her criminal record. (T. 423, 809-48, 862, 902-03).

Plaintiff had been hospitalized several times as a teenager due to suicidal thoughts. (T. 388, 393). Since that time, she had received psychiatric treatment, including counseling and medication, on a regular basis. She was diagnosed with depressive disorder, post-traumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), attention deficit hyperactivity disorder ("ADHD"), and anti-social personality disorder. (T. 451, 590-91, 861, 865). Plaintiff was hospitalized in 2011 following an overdose of Xanax, but insisted that it was caused by carelessness, not suicidal intent. (T. 902, 940). In addition to her mental impairments, plaintiff also received treatment for asthma, migraine headaches, and fibromygalia. (T. 44, 486, 588-89). Plaintiff also testified that, since 2011, she had suffered from neck pain that made it difficult to sit, stand, walk, or lift anything greater than five pounds. (T. 599-601).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 14-16, 18-20). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. ALJ's DECISION

As an initial matter, the ALJ determined that plaintiff met the insured status requirement for DIB through December 31, 2007. (T. 553).  At step one of the sequential analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability on January 1, 2007. (*Id*.).  Next, the ALJ determined that plaintiff's bipolar disorder, obsessive compulsive disorder, anxiety disorder, attention deficit hyperactivity disorder, asthma, and fibromyalgia[3] were severe impairments. (T. 554).  At the third step, the ALJ determined that plaintiff's impairments did not meet or medically equal the criteria of the listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P, including Listings 3.03 (asthma), 12.04 (affective disorders), and 12.06 (anxiety-related disorders).  (T. 554-55).

The ALJ next concluded that plaintiff retained the residual functional capacity ("RFC") to perform less than the full range of light work. (T. 555).  Specifically, plaintiff was limited to performing only simple tasks; working primarily alone, with only occasional supervision; and avoiding concentrated exposure to respiratory irritants. (T. 555-61).  While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, the ALJ decided that plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent that they were inconsistent

---

[3] The ALJ noted that plaintiff's medical records did not include a diagnosis of fibromyalgia and that treatment notes made only a passing reference to the disorder.  However, in light of plaintiff's testimony that she took medication for fibromyalgia, the ALJ concluded that it was a severe impairment. (T. 554, 589, 977, 979).

with the RFC. (T. 556).

At step four, the ALJ concluded that plaintiff had no past relevant work. (T. 561). The ALJ thus proceeded to step five and, based upon VE testimony, determined that there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (T. 562.)  Therefore, the ALJ determined that plaintiff had not been under a disability from the alleged onset date of January 1, 2007 through the date of his decision. (T. 562).

## V.   ISSUES IN CONTENTION

Plaintiff makes the following claims:

(1)   The ALJ improperly weighed the medical opinion evidence, and his RFC determination was not supported by substantial evidence. (Pl.'s Br. at 11-23, Dkt. No. 11).

(2)   The ALJ improperly determined that there were jobs in the national economy that plaintiff could perform. (Pl.'s Br. at 23-25).

(3)   This court should add newly-submitted medical evidence to the record on appeal and remand for a new hearing so that the Commissioner can re-assess plaintiff's disability claim in light of such new evidence. (Pl.'s Br. at 20; Pl.'s Motion for Leave to Submit New Evidence and Proposed Exhibits 28F & 29F, Dkt. Nos. 11-1, 11-2, 11-3).

Defendant argues that the Commissioner's decision was supported by substantial evidence, and that plaintiff's new evidence is not material to the ALJ's determination. (Def.'s Br. at 5-17) (Dkt. No. 12).  As discussed below, this court agrees with defendant and will recommend dismissal of the complaint.

## VI.   RFC/TREATING PHYSICIAN

### A.   Legal Standards

#### 1.   RFC

Residual functional capacity is "what [the] individual can still do despite his or her limitations.  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations.  *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6

(N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

As noted above, the ALJ determined that plaintiff had the RFC to perform "light work" with certain nonexertional limitations. Under 20 C.F.R. §§ 404.1567(b) & 416.967(b), light work is defined as follows:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Social Security Ruling 83-10 elaborates on the requirements of light work:

> Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time.

SSR 83-10, 1983 WL 31251, at *5-6. *See also Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) ("The full range of light work requires intermittently standing or walking for a total of approximately 6 hours of an 8-hour workday, with sitting occurring intermittently during the remaining time.").

### 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v.*

*Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran v. Barnhart*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### B.     Application - RFC/Treating Physician

#### 1.     Physical Limitations

Plaintiff contends that the ALJ did not properly weigh the restrictive opinion of plaintiff's treating neurologist, Dr. Ijaz Rashid, and thus erred in finding that plaintiff was capable of performing light work. (Pl.'s Br. at 12-16). This court disagrees, and concludes that the ALJ's RFC assessment of plaintiff's physical impairments was supported by substantial evidence.

In reaching his RFC determination, the ALJ gave "significant weight" to the opinions of Dr. Kalyani Ganesh, who conducted consultative examinations of plaintiff on March 10, 2009 and August 30, 2012. (T. 384-87, 870-75). In 2009, the only physical impairments raised by plaintiff were a history of urinary tract infections and asthma. (T. 384). During the 2009 examination, plaintiff reported that she was "coming along fine except she has some pain when she urinates." (*Id*.). Plaintiff's asthma was usually triggered by heat and cold, and was treated with an inhaler. (*Id*.). Plaintiff reported that she could do some cooking and cleaning, and she did shopping and laundry once a week. (T. 385). During the examination, plaintiff did not appear in acute distress, showed a normal gait, could walk on heels and toes without difficulty,

and did not need any assistance getting on or off the examination table or rising from a chair. (*Id.*). Her cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (T. 386). She showed full strength in her upper and lower extremities and hands. *(Id.)*. Dr. Ganesh opined that plaintiff had no gross physical limitations for sitting, standing, walking, and using her upper extremities. (T. 387).

In 2012, Dr. Ganesh conducted another consultative examination after plaintiff's case was remanded, and she reached similar conclusions. (T. 870-73). Plaintiff again reported a history of urinary tract infections and asthma, as well as daily headaches. (T. 870). Plaintiff reported that she cleaned "10 to 20 times a week" and did laundry once a week. She showered and dressed herself daily and typically spent the day with her mother and stepfather. (T. 871). Plaintiff appeared in no acute distress, exhibited a normal gait, and could walk on heels and toes without difficulty. (*Id.*). She did not require any assistance changing for the examination, getting on and off the examination table, or rising from a chair. (*Id.*). Her cervical and lumbar spine again showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (T. 872). Plaintiff showed full strength in her upper and lower extremities and hands. (*Id.*). As before, Dr. Ganesh opined that plaintiff had no gross limitations for sitting, standing, walking or using her upper extremities. In light of plaintiff's asthma, she also opined that plaintiff should avoid known respiratory irritants. (*Id.*).

The ALJ cited other record evidence that supported his conclusion that plaintiff was capable of performing light work. (T. 560). The ALJ noted that, at the time of the

hearing, plaintiff took medication for asthma and fibromyalgia. (T. 559-60). Dr. Robert Shelly, M.D., plaintiff's primary care physician, found that plaintiff's asthma was controlled and advised plaintiff in July 2012 to stay as active as possible. (T. 966). While a January 18, 2011 MRI showed narrowing of the cervical spine, and plaintiff testified that her neck pain was disabling, the only treatments prescribed at the time were pain medication and physical therapy. (T. 521-22, 600, 885). At the time of the hearing, plaintiff had not had physical therapy for about a year. (T. 600).

While the ALJ considered Dr. Rashid's treatment notes as part of his RFC determination, he assigned Dr. Rashid's March 18, 2011 Medical Source Statement little weight. (T. 559, 561). In his report, Dr. Rashid opined that plaintiff could only sit for about fifteen minutes before needing to alternate postures by walking around, and was only able to sit for a total of two hours in an eight hour workday. (T. 514, 559). Plaintiff would need to walk about thirty minutes before returning to a seated position, and could only sit for a total of about two hours each workday. (T. 515, 559). Dr. Rashid also stated that plaintiff needed to lie down for one hour after standing or walking for thirty minutes, and she could only stand or walk for a total of four hours during an eight hour workday. (T. 515-16, 559). He further opined that plaintiff would need to lie down for a total of three hours in an eight hour workday, in order to relieve pain. (T. 516, 559). Dr. Rashid also found that plaintiff could only occasionally lift up to five pounds. (T. 517, 559). She was frequently able to balance on level terrain, but could only occasionally stoop or move her neck. (*Id*.). Dr. Rashid attributed these

limitations to plaintiff's migraines and brachial neuritis[4]. (T. 513).

Plaintiff contends that the ALJ erred in discounting Dr. Rashid's opinion and failed to provide good reasons for doing so. (Pl.'s Br. at 14-16). However, a review of the ALJ's determination shows that he provided several reasons for assigning the treating physician's Medical Source Statement little weight, and this court concludes that the ALJ's evaluation of Dr. Rashid's opinion was supported by substantial evidence.

First, the ALJ noted the lack of treatment notes supporting Dr. Rashid's opinion. (T. 560). On October 20, 2010, Dr. Rashid evaluated plaintiff for the first time, and made mostly "normal" findings. (T. 483-84). Plaintiff had full strength in her shoulders, elbows, wrists, and hands. (T. 484). She had normal sensation to touch, temperature, vibration and pinprick in all extremities, and walked with a normal gait and station. (*Id.*). He made similar findings in November and December 2010. (T. 533-36). Treatment notes dated January 5, 2011 indicate that plaintiff complained of neck pain for the first time, but that Dr. Rashid's physical examination was "unremarkable other than tenderness on the posterior aspect of the neck and left scapula." (T. 523). A January 18, 2011 MRI showed narrowing of the left C6-C7 neural foramen to a "significant degree" and a congenitally narrow spinal canal. (T. 526). However, a follow-up examination on January 21, 2011 was again "unremarkable" and Dr. Rashid did not identify any strength deficits or difficulty walking, sitting or standing. (T. 520-

---

[4] Brachial neuritis is an inflammation of the network of nerves that runs through the shoulder and down the arm. http://www.spine-health.com/conditions/neck-pain/brachial-neuritis -parsonage-turner-syndrome

22). Dr. Rashid's March 18, 2011 treatment notes did not include any physical examination results, but noted plaintiff's reports of neck pain that prevented her from picking up her daughter and was largely unresponsive to medication. (T. 884). Dr. Rashid advised plaintiff to continue physical therapy and referred her to a pain management clinic. (*Id*.).

The ALJ also cited the overall conservative nature of plaintiff's treatment as an additional factor in his assignment of little weight to the significant restrictions found by Dr. Rashid in March 2011. (T. 560). As of April 16, 2012, plaintiff had not been evaluated by a pain clinic, notwithstanding Dr. Rashid's referral in March of 2011. (T. 968). On July 30, 2012, plaintiff advised Dr. Shelly that she had been to a pain clinic but did not want to return. (T. 965). At the time of the hearing, plaintiff had not had physical therapy in over a year, and was not receiving any other treatment for her pain except for Lyrica, which had been prescribed for her fibromyalgia. (T. 600).

In addition to its conflict with Dr. Ganesh's findings and Dr. Shelly's treatment notes, the ALJ also found that Dr. Rashid's opinion that plaintiff could only sit for a period of fifteen minutes before walking around and lying down did not correspond to plaintiff's behavior during the hearing. (T. 560). The ALJ noted that plaintiff sat throughout the hearing, which lasted almost two hours, without asking to alternate positions or lie down. (*Id*.). The record provides other examples of plaintiff engaging in physical activities that are inconsistent with Dr. Rashid's opinion. In April 2012, plaintiff reported that she was sore from "all of the activity last week with her daughter being home from school." (T. 909). Plaintiff traveled to North Carolina for a week's

vacation with family in May 2012, and traveled to Florida to visit a sick relative in January 2013. (T. 909, 931). Plaintiff was also arrested in July 2012 after punching someone in the face during an argument, and described a violent altercation with her girlfriend in January 2013. (T. 912, 925, 931).

The report of a consultative examiner may serve as substantial evidence upon which the ALJ may base his decision. *Herb v. Colvin*, No. 14-CV-156, 2015 WL 2194513, at *5 (W.D.N.Y. May 6, 2015) (citing *Finney ex rel. B.R. v. Colvin*, No. 13-CV–543A, 2014 WL 3866452, at *7 (W.D.N.Y. Aug. 6, 2014) (Rep't-Rec.)); *Simmons v. Comm'r of Soc. Sec.*, No. 13-CV-5504, 2015 WL 2182977, at *16 (S.D.N.Y. May 8, 2015) (citing *Mongeur*, 722 F.2d at 1039). Here, the ALJ relied upon the consultative opinion of Dr. Ganesh and other evidence in the record to assess plaintiff's physical RFC. Thus, the ALJ's determination that plaintiff had the physical RFC to perform light work was supported by substantial evidence.

## 2. Mental Limitations

As noted above, the ALJ limited plaintiff to light work that involved only simple tasks, and where plaintiff could work primarily alone, with only occasional supervision. (T. 555). Plaintiff argues that the ALJ did not properly weigh the medical evidence regarding plaintiff's mental impairments, particularly the evidence regarding plaintiff's difficulties with concentration, persistence, and pace. (Pl.'s Br. at 16). This court disagrees, and concludes that the ALJ's assessment of plaintiff's mental impairments was supported by substantial evidence.

In reaching the RFC determination, the ALJ gave "some weight" to the August

30, 2012 opinion of consultative examiner Dr. Jeanne Shapiro, who opined that plaintiff was capable of following and understanding simple instructions and directions, but may have difficulty performing some simple and complex tasks independently "due both to ADHD and lack of motivation and lethargy." (T. 558-60, 864). Dr. Shapiro found that plaintiff had difficulty maintaining attention and concentration on a consistent basis, but may be able to learn some new rote tasks. (T. 864). Plaintiff had difficulty maintaining a schedule, due to transportation issues. Some of these transportation issues stemmed from plaintiff's reported inability to take public transportation because she could not be around many people, but also resulted from the suspension of her driver's license. (T. 864). Dr. Shapiro concluded that the examination results appeared consistent with psychiatric problems that may significantly interfere with her daily functioning. (*Id*.). In a Medical Source Statement completed after the examination, Dr. Shapiro found that plaintiff had marked limitations in interacting appropriately with the public, supervisors, co-workers, and in responding appropriately to usual work situations and changes in a routine work setting. (T. 867). Dr. Shapiro found that plaintiff's prognosis may be somewhat better with more comprehensive treatment with a psychiatrist and clinical psychologist. (T. 865).

During the examination, plaintiff reported that she had difficulty sleeping, and suffered from PTSD, stemming from the death of her cousin from cancer in 2008. (T. 862). She had nightmares and flashbacks, and worried about her own health and the health of the people that she cared about. (*Id*.). She avoided situations where there

were a lot of people around because she did not feel safe, and sometimes she self-isolated and wanted to be left alone. (T. 862). Plaintiff was able to dress herself, and reported that she bathed herself more than three times a day. (T. 864). She could cook and prepare simple meals, but had her mother do her shopping for her because she was uncomfortable around many people. (T. 864). Dr. Shapiro observed that plaintiff's demeanor and responsiveness to questions was cooperative, and she had an adequate manner of relating, social skills, and overall presentation. (T. 863). Her attention and concentration were grossly intact, and plaintiff was able to do counting, simple calculations, and serial threes. (*Id.*). Plaintiff exhibited appropriate eye contact and coherent and goal directed thought processes, but had a depressed and anxious affect. (*Id.*).

Plaintiff contends that the ALJ inappropriately discounted Dr. Shapiro's opinion by finding "that Dr. Shapiro indicated that the claimant's lack of motivation was a contributing factor with regard to the claimant's symptoms." (T. 560). Plaintiff argues that Dr. Shapiro only found that a lack of motivation, along with lethargy and ADHD, impacted plaintiff's ability to perform tasks, and did not extend to other functional areas such as maintaining attention and concentration, making appropriate decisions, relating to others, or appropriately dealing with stress. (Pl.'s Br. at 21-22). In addition to Dr. Shapiro's report, the ALJ cited other record evidence that referenced a lack of motivation as a "contributing factor" to plaintiff's difficulties. (T. 560). In September 2009, plaintiff told her therapist that she had too much free time, was lacking in structure, and was not keeping busy enough. (T. 423). In September 2011, plaintiff

reported that "she did not know what to do with herself" after her daughter had started school. (T. 979). However, even if the court were to conclude that the ALJ erred by not specifying exactly which symptoms were impacted by a lack of motivation, such error would be harmless because there is no indication that it would have changed the ALJ's disability determination. The ALJ's RFC assessment incorporated Dr. Shapiro's findings that plaintiff had marked limitations in interacting with others; had "difficulty" performing tasks; and did "not always make appropriate decisions . . . or appropriately deal with stress." (T. 561, 864). Dr. Shapiro did not identify any significant limitations in attention and concentration during the examination. Her report described plaintiff's attention and concentration as grossly intact, and only noted that plaintiff's reported memory and concentration problems may make it difficult for plaintiff to manage her own accounts. (T. 862, 868). This is consistent with the opinions of Dr. Kristen Barry, who opined after a 2009 consultative examination that plaintiff had fair attention and concentration in a structured environment, and Dr. T. Harding, a non-examining state consultant who reviewed plaintiff's records in April 2009, and found moderate limitations in plaintiff's ability to perform activities within a schedule, maintain regular attendance, work in coordination or proximity to others without being distracted, and perform at a consistent pace. (T. 391, 409-10, 557). The ALJ assigned the opinions of Dr. Barry and Dr. Harding "some weight" because of their general consistency with the overall record. (T. 561).

The ALJ also assigned "some weight" to the opinion of Dr. Abbas Ispahani, who was plaintiff's treating psychiatrist between September 2009 and November 2011. (T.

901).  Dr. Ispahani completed a medical examination for employability assessment on December 29, 2009, and a Medical Source Statement on October 14, 2010.  (T. 451-54, 557, 1049-50).  In December 2009, Dr. Ispahani opined that plaintiff was "very limited" in maintaining attention and concentration, making simple decisions, interacting appropriately with others, and functioning in a workplace at a consistent pace. (T. 1049).  At the time, he expected plaintiff's limitations to last longer than ninety days, but did not recommend referral to a rehabilitation or mental health facility. (T. 1050).  Dr. Ispahani issued a slightly less restrictive Medical Source Statement in October 2010, in which he opined that plaintiff's depression and anxiety caused moderate limitations in understanding, remembering and carrying out simple instructions; understanding, remembering, and carrying out complex instructions; and making judgments on complex work-related decisions. (T. 452).  He still found marked limitations in plaintiff's ability to interact appropriate with the public, supervisors, and co-workers, and in plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting. (T. 453).

Plaintiff contends that Dr. Ispahani's opinion should have been assigned controlling weight because it came from a treating physician. (Pl.'s Br. at 19).  The ALJ recognized Dr. Ispahani as a treating source, but also noted that his treatment of plaintiff ended in November 2011.[5] (T. 557-60).  The ALJ incorporated certain of Dr. Ispahani's findings into his RFC determination. (T. 560).  These included the opinions

---

[5] Plaintiff reported that she ended this treatment relationship because she did not feel comfortable with a male therapist. (T. 902).

that plaintiff had moderate limitations in her ability to understand, remember and carry out instructions; moderate limitations in her ability to make judgments on complex work-related decisions; and marked limitations in interacting with others. (T. 560-61). However, the ALJ noted that Dr. Ispahani's most restrictive findings were not consistent with other substantial evidence in the record. (T. 560).

In addition to the consultative opinion evidence, discussed above, that found fewer limitations in plaintiff's attention, concentration, and memory, the ALJ also concluded that Dr. Ispahani's opinion was inconsistent with plaintiff's most recent psychiatric treatment notes. (*Id.*). The ALJ gave "great weight" to the opinion of Sandra Zambello, a nurse practitioner ("NP") who began treating plaintiff in December 2011. (T. 558, 561, 902). In treatment notes dated February 8, 2012, NP Zambello reported that plaintiff appeared oriented and alert, while demonstrating a cheerful mood with an appropriate affect. (T. 558, 905). She also found that plaintiff's attention, concentration, and focus had improved since being on medication and that plaintiff showed greater impulse control. (*Id.*). The ALJ cited NP Zambello's similar findings in March and April 2012 regarding plaintiff's intact attention, concentration and focus while on medication. (T. 558, 907-09). On July 13, 2012, plaintiff expressed concerns about poor impulse control and anger management, but still demonstrated alertness and improved attention, concentration and focus. (T. 912). NP Zambello also observed this improved attention, concentration and focus in August, September, and October 2012. (T. 915-16, 919, 921, 924). When plaintiff's medication was altered in January 2013, NP Zambello observed greater distractibility, but advised plaintiff that she needed to

give the new medication a chance to work before she would see positive results. (T. 928-29). Plaintiff again demonstrated improved attention, concentration and focus in February 2013. (T. 935).

Plaintiff argues that the ALJ erred in assigning NP Zambello's opinion great weight, particularly when it served to discount Dr. Ispahani's findings regarding plaintiff's attention, focus, and concentration. (T. 560). While NP Zambello is not an acceptable medical source under the regulations, the ALJ was entitled to rely on her professional assessment of the severity of plaintiff's impairment and the resulting functional effects. *Luffman v. Comm'r of Soc. Sec.*, No. 7:12-CV-317 (NAM/ATB), 2013 WL 1386639, at *7 (N.D.N.Y. Mar. 14, 2013) (finding that ALJ could rely upon physical therapist's opinion); *see also Cuevas v. Colvin*, No. 1:14-CV-855 (MAD/TWD), 2015 WL 4715272, at *8-9 (N.D.N.Y. Aug. 7, 2015) (ALJ erred by failing to consider examination notes prepared by nurse practitioner). NP Zambello did not diagnose plaintiff with any particular condition, but rather evaluated the severity of plaintiff's impairments and how it affected her ability to perform work-related activities. (T. 561, 905-29). This is consistent with the regulations discussing "Medical and other evidence of your impairment(s)," which state that medical doctors are sources who can provide evidence to establish an impairment, and NPs are "other sources" whose opinions can help show the severity of an established impairment and how it affects one's ability to work. 20 C.F.R. § 404.1513(a), (d). Thus, the ALJ was entitled to rely on NP Zambello's assessment of plaintiff's functional limitations, and had the discretion to determine the appropriate weight to accord her opinion based on all the

record evidence. *McQuade v. Colvin*, No. 3:14-CV-1044 (GTS), 2015 WL 7283185, *8 (N.D.N.Y. Nov. 16, 2015).

It is the province of the ALJ to resolve genuine conflicts in the record. *Veino v. Barnhart*, 312 F.3d at 588. However, the Commissioner need not "reconcile explicitly every shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 66 (2d Cir. 2008) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). Here, the ALJ resolved conflicts between the various medical opinions by assigning the greatest weight to those opinions that he deemed most consistent with plaintiff's overall treatment record and activities. In doing so, the ALJ appropriately evaluated the conflicting medical evidence, and made an RFC finding that was consistent with the overall record. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole).

## VII. <u>VOCATIONAL EXPERT</u>

### A. **Legal Standards**

At step five of the disability analysis, the burden shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). "Work which exists in the national economy" means work existing in significant numbers "either in the region where the individuals live or in several regions of the country." *McCusker v. Comm'r of Soc. Sec.*, No. 1:13-CV-1074, 2014 WL 6610025, at *3 (N.D.N.Y. Nov. 20, 2014) (quoting SSR

82-53, 1982 WL 3134, at *3 (1982) (internal quotation marks removed). This definition emphasizes "that . . . a type[] of job which exists only in very limited numbers or in relatively few geographic locations may not be said to 'exist in the national economy.'" *Id.* However, what constitutes a "significant" number is "fairly minimal." *Id.* (quoting *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009)).

In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[6] are present or when exertional impairments do not fit

---

[6] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

If the ALJ utilizes a VE at the hearing, the VE is asked a hypothetical question or questions which incorporate plaintiff's limitations. Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996). The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based his opinion." *Dumas*, 712 F.2d at 1554; *see also Peatman v. Astrue*, No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas*, 712 F.2d at 1553-54).

## B.     Application

Because the ALJ found that plaintiff's nonexertional and exertional limitations would narrow the range of light work that plaintiff could perform, the ALJ utilized the services of a VE. (T. 562, 608-21). The ALJ offered the VE the hypothetical of an

individual of plaintiff's age, education, and work experience who could perform light

work and was capable of frequent reaching, but was limited to simple tasks, should

work primarily alone with only occasional supervision, and must avoid concentrated

exposure to respiratory irritants. (T. 608). The VE suggested two representative

examples of occupations that such an individual could perform: housekeeper/cleaner

and agricultural produce sorter. (T. 562, 609).

Plaintiff argues that because the ALJ erred with respect to his RFC analysis, the

hypothetical question did not take all of plaintiff's impairments into account. (Pl.'s Br.

at 23-25). However, because this court has found that the ALJ's findings regarding

plaintiff's RFC were supported by substantial evidence, his hypothetical question that

mirrored the RFC and the resulting reliance upon the VE testimony were similarly

supported by substantial evidence.

## VIII. <u>NEWLY SUBMITTED EVIDENCE</u>

### A.    **Legal Standard**

A case may be remanded to the Commissioner for reconsideration based on new

evidence first submitted to the district court if the plaintiff is able to show that the new

evidence "is material and that there [wa]s good cause for the failure to incorporate such

evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). To carry this

burden, a plaintiff must show that "(1) the proffered evidence is new and not merely

cumulative of what is already in the record; (2) the proffered evidence is material,

meaning that it is (a) relevant to his condition during the time period for which benefits

were denied; (b) probative; and (c) reasonably likely to have influenced the

Commissioner to decide his application differently; and (3) good cause exists for his failure to present the evidence earlier." *Mulrain v. Commissioner of Social Sec.*, 431 F. App'x 38, 39 (2d Cir. 2011).

### B. Application

The new evidence submitted by the plaintiff to the district court consists of an April 3, 2014 report entitled Examination for Employability Assessment, Disability Screening, and Alcohol/Drug Addiction (Dkt. No. 11-2), and treatment notes from the same date (Dkt. No. 11-3), both prepared by NP Zambello. Plaintiff concedes that both documents are dated after the ALJ's determination. (Dkt. No. 11-1, ¶ 5). The examination report indicates that NP Zambello did not find any restrictions or severe impairments that had lasted or were expected to last at least twelve months. (Dkt. No. 11-2, at 2). The treatment notes address only plaintiff's current condition on April 3, 2014 and note that plaintiff had "a new set of stressors" that included feeling overwhelmed with the loss of her job,[7] the possibility of going to prison and the eviction." (Dkt. No. 11-3, at 1). Further, this "new" evidence is not material to plaintiff's condition through the time of the ALJ's May 29, 2013 determination. Accordingly, this court declines to consider the records in reviewing the ALJ's decision.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the

---

[7] There is no further information regarding plaintiff's apparent employment in 2014 so it is unclear if this job would constitute substantial gainful activity under the regulations.

plaintiff's complaint be **DISMISSED**; and it is further

      **RECOMMENDED**, that plaintiff's Motion for Leave to Submit New Evidence (Dkt. No. 11-1) be **DENIED**.

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:     March 1, 2016

                                    Hon. Andrew T. Baxter
                                    U.S. Magistrate Judge